### STATE OF CONNECTICUT *v.* LIONEL BROWN
### (14883)

Peters, C. J., and Borden, Berdon, Norcott, Katz, E. Y. O'Connell and M. Hennessey, Js.

Argued September 21—decision released December 19, 1995

*Carolyn K. Longstreth,* assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan,* state's attorney, and *Philip D'Eramo,* former assistant state's attorney, for the appellant-appellee (state).

*Lauren Weisfeld,* assistant public defender, for the appellee-appellant (defendant).

PETERS, C. J. The principal issue in this certified appeal is whether, upon the receipt of information alleging serious jury misconduct, a trial court has a duty to conduct an inquiry into the allegations even in the absence of a proper request by counsel. After a jury trial, the defendant, Lionel Brown, was convicted of, inter alia,[1] forgery in the third degree in violation of General Statutes § 53a-140 (a)[2] and attempted larceny

---

[1] The defendant also was convicted of conspiracy to commit larceny in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-124 (a) (2), and criminal impersonation in violation of General Statutes § 53a-130 (a) (1). He has not contested these convictions. The jury acquitted the defendant of larceny in the fourth degree in violation of General Statutes § 53a-125 (a) and conspiracy to commit larceny in the fourth degree in violation of General Statutes §§ 53a-48 (a) and 53a-125 (a).

[2] General Statutes § 53a-140 provides in relevant part: "Forgery in the third degree: Class B misdemeanor. (a) A person is guilty of forgery in the third degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument, or issues or possesses any written instrument which he knows to be forged."

General Statutes § 53a-137 provides in relevant part: "Definitions. The following definitions are applicable to this part . . . .

"(5) A person 'falsely completes' a written instrument when, by adding, inserting or changing matter, he transforms an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it, so that such complete instrument appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker or drawer. . . .

"(7) 'Forged instrument' means a written instrument which has been falsely made, completed or altered."

in the third degree in violation of General Statutes §§ 53a-49 (a) and 53a-124 (a) (2).[3] The trial court rendered judgment on the jury verdict and the defendant appealed to the Appellate Court, which reversed his convictions in part on grounds of insufficiency of the evidence, but rejected his claim of jury misconduct. *State* v. *Brown*, 33 Conn. App. 339, 635 A.2d 861 (1993).

We then granted the state's and the defendant's petitions for certification to appeal from the judgment of the Appellate Court.[4] The appeal was originally argued before a five judge court. See *State* v. *Brown*, 232 Conn.

---

[3] General Statutes § 53a-49 provides in relevant part: "Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-124 provides in relevant part: "Larceny in the third degree: Class D felony. (a) A person is guilty of larceny in the third degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds one thousand dollars . . . ."

General Statutes § 53a-119 provides in relevant part: "Larceny defined. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[4] We granted the state's petition for certification to appeal, limited to the following issues:

"1. Whether the Appellate Court properly reversed the defendant's conviction of forgery in the third degree on the ground of insufficient evidence?

"2. Whether the Appellate Court properly reduced the defendant's conviction of attempted larceny in the third degree to attempted larceny in the fourth degree on the ground that General Statutes § 53a-121 (b), which permits aggregation of the amounts of separate thefts when committed pursuant to a scheme, does not apply to attempts?" *State* v. *Brown*, 228 Conn. 926, 638 A.2d 40 (1994).

We granted the defendant's petition for certification to appeal, limited to the following issue:

"Should the Appellate Court have directed the trial court to conduct a hearing into allegations of juror misconduct in the circumstances of this case?" *State* v. *Brown*, 228 Conn. 925, 638 A.2d 40 (1994).

431, 656 A.2d 997 (1995). Thereafter, we granted the state's motion for en banc reargument and reconsideration of the same certified issues. See, e.g., *State* v. *Chapman*, 229 Conn. 529, 532, 643 A.2d 1213 (1994); *State* v. *Medina*, 228 Conn. 281, 284 n.4, 636 A.2d 351 (1994). We now reverse the judgment of the Appellate Court.[5]

The opinion of the Appellate Court describes many of the facts that the jury reasonably could have found.[6] "On May 8, 1991, at approximately 2:45 p.m., the defendant entered the Gateway Bank in Wilton. He identified himself as Clifford Sailer and attempted to make a split deposit[7] involving two checks. One check for deposit was made out to and endorsed by Clifford Sailer in the amount of $728.90; the other check, in the amount of $960 made payable to and endorsed by Sailer, was to be cashed.[8]

"The teller was suspicious of the defendant because she was acquainted with Sailer, who is white, and the defendant is black. According to the teller, the endorsements on the checks appeared to be Sailer's.[9] Because the defendant could not produce any identification, the teller refused to make the transactions. The defendant then left the bank, taking the checks with him. The teller notified the bank manager of the incident and the

[5] To the extent that the dissent relies on language from the opinion by the five judge court; see *State* v. *Brown*, supra, 232 Conn. 431; we reject the proposition that the earlier opinion has continuing validity. Our decision today supersedes our earlier opinion in its entirety.

[6] The opinion of the Appellate Court misspelled Clifford Sailer's name and misstated the amounts of two of the checks involved in the case. Accordingly, we have made the appropriate corrections to the Appellate Court's statement of facts.

[7] "A split deposit is the simultaneous depositing of one or more checks and the cashing of another." *State* v. *Brown*, supra, 33 Conn. App. 341 n.4.

[8] The first check, which the defendant attempted to deposit, was drawn on the account of Beth Anne Onderko. The second check, which the defendant attempted to cash, was drawn on the account of St. Pauls Inn.

[9] The teller was unable to locate Sailer's signature card and thus could not compare the endorsements with Sailer's actual signature.

manager put an alert signal into the bank computer system.

"Soon thereafter, a man, who identified himself as Robert Black, attempted to make a split deposit involving three checks: two for deposit in the amounts of $776.10 and $78, and the third to be cashed in the amount of $880. All three were payable to Robert Black and endorsed in general on the back. He too lacked identification. The bank manager refused to make the transactions and the second man left. The bank manager then observed this man join the defendant and a woman in a car. The bank manager wrote down the license plate number of the car and called the Wilton police.

"Shortly thereafter, Officer Gary Garuder of the Wilton police department stopped the car and arrested the three occupants. The driver, the woman, had identification in several names, along with $600 in cash. One of the men, the second man to enter the bank, had $453. The defendant had valid identification, $32, a deposit slip with Clifford Sailer's address written on it, a paper on which another name and address were written, and two checks totaling $1192.90 made out to Barbara Matison. Garuder seized a manila envelope from the car. Among the items in the envelope were various bank papers, checks, checkbooks, torn signature cards, customer receipts, and change of name forms."[10] *State* v. *Brown*, supra, 33 Conn. App. 341–42.

---

[10] The manila envelope contained the five checks presented to Gateway Bank by the defendant and the man who had identified himself as Black. The envelope also contained two additional completed checks totaling $1627.76 payable to John Russell, as well as blank checks from nine separate checking accounts, including those of Beth Anne Onderko and St. Pauls Inn. None of these checking accounts belonged to the defendant or the two other people in the automobile.

The bank papers in the envelope included as well: a deposit ticket and a photocopy of bank forms bearing Sailer's New Jersey address and telephone number and former Connecticut address; a computer printout from Gateway

The Appellate Court concluded that this evidence was insufficient to sustain the defendant's conviction of forgery in the third degree because there was no evidence that Sailer had not endorsed the checks that the defendant had presented to Gateway Bank. Id., 349. The Appellate Court also concluded that the evidence was insufficient to sustain the defendant's conviction of attempted larceny in the third degree because the court determined, as a matter of statutory construction, that the reference in General Statutes § 53a-121 (b)[11] to "committed" thefts impliedly precludes the aggregation of attempted thefts. Accordingly, the court modified the judgment on that count to attempted larceny in the fourth degree. Id., 352, 355. Finally, the Appellate Court rejected the defendant's claim that the trial court improperly had failed to conduct, sua sponte, a hearing in response to allegations of jury misconduct. The Appellate Court concluded that the trial court had possessed a sufficient factual basis upon which to determine whether jury misconduct actually had occurred and that the court had not abused its discretion in failing to conduct a hearing in order to investigate the alleged jury misconduct.[12] Id., 345–46.

The state and the defendant have both challenged the validity of the decision of the Appellate Court in

Bank bearing Black's address, social security number and savings account information; and a savings account withdrawal ticket bearing Matison's signature and account number. The bank papers were the type of papers that would usually be discarded at a bank in the normal course of business, and many had been torn apart and taped back together.

[11] General Statutes § 53a-121 provides in relevant part: "Value of property or services. . . . (b) Amounts included in thefts committed pursuant to one scheme or course of conduct, whether from the same person or several persons, may be aggregated in determining the grade of the offense."

[12] The Appellate Court also rejected the defendant's claim that he was entitled to a new trial because the letter containing allegations of jury misconduct received by the trial court also contained an allegation that a communication had occurred between a police detective and a witness, and that this communication constituted a violation of the court's order

various respects. The state maintains that it adduced sufficient evidence to support the defendant's convictions of forgery in the third degree and attempted larceny in the third degree. With respect to the conviction of attempted larceny in the third degree, the state argues that a proper construction of the applicable statutes permits aggregation of the dollar amounts that the defendant and his coconspirator attempted to steal from Gateway Bank. The defendant contends that the Appellate Court should have ordered the trial court to conduct an evidentiary hearing in order to investigate the alleged jury misconduct. We find both of the state's claims persuasive. To the extent that the defendant claims that the trial court abused its discretion by failing to conduct any type of inquiry whatsoever in response to the allegations of jury misconduct, we also find his claim persuasive. We therefore reverse the judgment of the Appellate Court on all three issues.

I

We first consider whether the Appellate Court properly concluded that there was insufficient evidence to support the defendant's conviction of forgery in the third degree. In order to prove forgery in the third degree, the state was required to establish beyond a reasonable doubt that the defendant (1) had falsely made, completed or altered a written instrument, or had knowingly issued or possessed any written instrument that had been falsely made, completed or altered, (2) while possessing an intent to defraud, deceive or injure another. General Statutes § 53a-140 (a).[13] The state claims that the Appellate Court assigned insufficient weight to the strength of the circumstantial evidence that had established the defendant's guilt of

sequestering the witnesses. *State* v. *Brown*, supra, 33 Conn. App. 346–48. This issue has not been certified for further appellate review.

[13] See footnote 2.

forgery in the third degree beyond a reasonable doubt. We agree.

"When an appeal challenges the sufficiency of the evidence to justify a verdict of guilty, we have a twofold task. We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the verdict. . . . We then determine whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Citations omitted; internal quotation marks omitted.) *State* v. *Carpenter*, 214 Conn. 77, 78–79, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992); see *State* v. *Sauris*, 227 Conn. 389, 399, 631 A.2d 238 (1993); *State* v. *Joyner*, 225 Conn. 450, 455, 625 A.2d 791 (1993). "It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Crafts*, 226 Conn. 237, 245, 627 A.2d 877 (1993).

The scope of our factual inquiry on appeal is limited. "This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Scielzo*, 190 Conn. 191, 197, 460 A.2d 951 (1983). "[I]n viewing evidence which could yield con-

trary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Francis*, 228 Conn. 118, 127, 635 A.2d 762 (1993); see *State* v. *Breton*, 235 Conn. 206, 221, 663 A.2d 1026 (1995); *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994).

Applying these well established principles in this case, we conclude that the evidence presented by the state could have persuaded the jury, beyond a reasonable doubt, that the defendant had committed the crime of forgery in the third degree. The state showed that the defendant and one of his coconspirators had falsely represented their identities and had attempted to cash checks at Gateway Bank. Furthermore, when arrested by the police, the defendant and his coconspirators possessed blank checks from nine separate checking accounts, including blank checks from the same accounts as the checks that the defendant had attempted to cash at Gateway Bank. They also possessed various bank papers and several checks payable to persons identified in those papers. Although the defendant had valid identification, his male coconspirator possessed no identification, and his female coconspirator possessed several forms of false identification. The jury reasonably could have inferred from this evidence that the defendant and his coconspirators were engaged in a scheme to cash forged checks. Further, the jury reasonably could have inferred that the defendant and his coconspirators had possessed the various completed and blank checks without the account holders' permission. The jury reasonably could have inferred, as well, that the defendant and his coconspira-

tors had obtained information relating to actual bank customers from discarded bank papers. Finally, the jury reasonably could have inferred that the defendant and his coconspirators then had falsely completed the blank checks in their possession by making them payable to actual bank customers, and had attempted to cash the forged checks by falsely representing themselves as the payees.

Furthermore, under § 53a-140 (a) the crime of forgery in the third degree encompasses not only the presentation of a forged instrument, but also the false completion of a written instrument. A person falsely completes a written instrument in violation of this statute when that person, "by adding, inserting or changing matter . . . transforms an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it, so that such complete instrument appears or purports to be in all respects . . . fully authorized by its ostensible . . . drawer." General Statutes § 53a-137 (5); see State v. Hahn, 207 Conn. 555, 561, 541 A.2d 499 (1988). In this case, the jury also reasonably could have determined that the checks drawn on the accounts of Beth Anne Onderko and St. Pauls Inn, and presented by the defendant to Gateway Bank, had been falsely completed. The defendant and his coconspirators possessed several blank checks from these accounts in the same envelope that contained blank and completed checks from seven other checking accounts, various bank papers and several different pens. From this evidence, taken in conjunction with the evidence that the defendant and his coconspirators were engaged in a scheme to cash forged checks, the jury reasonably could have inferred that, even if Sailer actually had endorsed the Onderko and St. Pauls Inn checks, those checks had been falsely completed. False completion would have been demonstrated if Sailer's name as payee, the check amounts or the drawers' signatures

had been added to blank checks without proper authorization.

Finally, there was evidence to support the inferences that the defendant knew that the checks that he presented to Gateway Bank had been forged and that he had an intent to defraud. Ordinarily, knowledge and intent can be proven only by circumstantial evidence; they may be and usually are inferred from a defendant's conduct. See *State* v. *Montanez*, 219 Conn. 16, 20, 592 A.2d 149 (1991); *State* v. *Carpenter*, supra, 214 Conn. 82; *State* v. *Simino*, 200 Conn. 113, 119, 509 A.2d 1039 (1986); *State* v. *Fredericks*, 149 Conn. 121, 124, 176 A.2d 581 (1961). In this case, the defendant carried two checks into Gateway Bank, falsely represented his identity to a bank teller and attempted to cash one of the checks and deposit the other. Upon his arrest, the defendant possessed two other completed checks payable to Matison and a slip of paper bearing the name and address of John Russell. The defendant and his coconspirators possessed blank checks from various accounts, including those of the checks that the defendant presented to Gateway Bank and those payable to Matison found in his possession. They also possessed two completed checks payable to Russell and bank papers that did not belong to any of them. In its totality, this evidence, although circumstantial, was sufficient to permit the jury to make the requisite findings of knowledge and criminal intent.

On the basis of the evidence and the inferences that reasonably could be drawn therefrom, the jury could have concluded beyond a reasonable doubt that the defendant had possessed forged instruments, had known that the instruments were forged and had possessed the intent to defraud. Because this evidence was sufficient to support the jury's verdict of guilty of forgery in the third degree, we reverse the contrary judgment of the Appellate Court.

## II

We next consider whether the Appellate Court properly concluded that the state had adduced insufficient evidence to sustain the defendant's conviction of attempted larceny in the third degree. The Appellate Court reversed this conviction on the ground that § 53a-121 (b) does not apply to attempted thefts. We disagree with the Appellate Court's construction of the statute.

The defendant and one of his coconspirators, within moments of one another, attempted to cash at the same bank two checks totaling $1840. This sum exceeds the $1000 threshold necessary to sustain a conviction of larceny in the third degree. General Statutes § 53a-124 (a) (2).[14]

The state consistently has argued that the applicable provisions of the penal code permitted the jury to aggregate the amounts of the two checks and to return a guilty verdict against the defendant for attempted larceny in the third degree. The state contends that the theft aggregation provision contained in § 53a-121 (b)[15] applies to attempted thefts if they are committed as part of one scheme or course of conduct.

The Appellate Court rejected the state's argument on the ground that the plain language of § 53a-121 (b) does not permit the aggregation of attempted thefts. The court held: "The language of § 53a-121 (b) refers only to aggregation for thefts *committed*. There is no provision providing for aggregation for thefts *attempted*." (Emphasis in original.) *State* v. *Brown,* supra, 33 Conn. App. 352. We disagree with this reasoning.

The proper resolution of this issue requires an analysis of the relationship between several separate provisions of the penal code. A person is guilty of criminal

[14] See footnote 3.

[15] See footnote 11.

attempt when, acting with the intent necessary to commit a crime, that person "intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." General Statutes § 53a-49 (a) (2). As applied to thefts, an attempt constitutes a crime of the same grade and degree as the most serious offense that is attempted. General Statutes § 53a-51.[16] Thus, the proper grade and degree of the defendant's attempted larceny must be determined by reference to the larceny statutes.

A person is guilty of larceny "when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119. The grade of the larceny offense depends upon the value of the property taken. If the value of the property exceeds $500, for example, the crime constitutes larceny in the fourth degree. General Statutes § 53a-125 (a). If the value of the property exceeds $1000, however, the crime constitutes larceny in the third degree. General Statutes § 53a-124 (a) (2). "Amounts included in thefts committed pursuant to one scheme or course of conduct" may be aggregated in order to determine the value of the property taken and, thus, the grade of the offense. General Statutes § 53a-121 (b).

Analyzing these statutes together, we are persuaded that § 53a-121 (b) applies to attempted thefts. Although § 53a-121 (b) does not provide expressly that attempted thefts may be aggregated, such explicit direction is

---

[16] General Statutes § 53a-51 provides: "Classification of attempt and conspiracy. Attempt and conspiracy are crimes of the same grade and degree as the most serious offense which is attempted or is an object of the conspiracy, except that an attempt or conspiracy to commit a class A felony is a class B felony."

unnecessary because the statute must be read in light of the penal code's attempt provision, § 53a-49. "It is a basic tenet of statutory construction that the intent of the legislature is to be found not in an isolated phrase or sentence but, rather, from the statutory scheme as a whole. *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, 226 Conn. 792, 808, 629 A.2d 367 (1993); *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 689, 620 A.2d 771 (1993). Furthermore, in reviewing the statutory language, we will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *State* v. *Breton*, supra, 235 Conn. 226. Section 53a-49 is a provision of general applicability and extends criminal liability for attempts to other penal code provisions. Accordingly, statutes such as § 53a-121 (b) do not, and need not, refer to attempt liability in order for such liability to apply. Thus, when § 53a-121 (b) is read together with § 53a-49, the term "thefts" in § 53a-121 (b) can be understood to refer to attempted thefts in addition to completed thefts.

Relying on the principle that criminal statutes must be narrowly construed, the Appellate Court reached a contrary conclusion by focusing on the fact that § 53a-121 (b), by its express terms, applies to thefts "committed" and contains no direct reference to thefts "attempted." *State* v. *Brown*, supra, 33 Conn. App. 352. The legislature's use of the term "committed" in § 53a-121 (b) does not, however, inform the issue of whether attempts may be aggregated under the statute, because the penal code makes it clear that attempts and target offenses both are crimes that can be "committed." See, e.g., *State* v. *Milardo*, 224 Conn. 397, 417, 618 A.2d 1347 (1993); *State* v. *Johnson*, 185 Conn. 163, 172, 174, 440 A.2d 858, aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983). Moreover, the Appellate Court's reasoning, which would preclude attempt liability for those penal

code provisions that use the term "commit" without expressly referring to attempts, would lead to unlikely results in other related circumstances. It would abrogate attempt liability in a whole host of penal code provisions that only refer to offenses "committed" or to which liability attaches only when an offender "commits" predicate conduct. See, e.g., General Statutes §§ 53a-35a (minimum mandatory sentences for felonies), 53a-59a (a) (assault of victim sixty years old or older in first degree), 53a-70 (a) (3) (sexual assault in first degree), 53a-70a (a) (aggravated sexual assault in first degree), 53a-122 (a) (larceny in first degree), 53a-135 (a) (robbery in second degree). Such a construction of the penal code would contravene the legislature's expressed intent to treat attempts as seriously as target offenses. General Statutes § 53a-51.[17] The principle of narrow construction of criminal statutes in favor of the accused; see *State* v. *Woods*, 234 Conn. 301, 308, 662 A.2d 732 (1995); cannot justify judicial interpolation of a limitation that frustrates an evident legislative intent and that is inconsistent with the penal code's overall statutory scheme. See *State* v. *Ross*, 230 Conn. 183, 200, 646 A.2d 1318 (1994), cert. denied,     U.S.    , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Stevens*, 224 Conn. 730, 736–37, 620 A.2d 789 (1993); *State* v. *Hufford*, 205 Conn. 386, 392, 533 A.2d 866 (1987); *State* v. *Roque*, 190 Conn. 143, 151, 460 A.2d 26 (1983).

Our conclusion that § 53a-121 (b) applies to attempted thefts finds further support in the relationship between attempted thefts and completed thefts. General Statutes § 53a-49 (a) specifies that the intent required to commit an attempted theft is identical to the intent required to commit the target theft. See *State* v. *Almeda*, 189 Conn. 303, 307, 455 A.2d 1326 (1983). Furthermore, § 53a-51 expressly provides that the grade of an attempted theft is identical to the grade of the

[17] See footnote 16.

target theft. These provisions demonstrate that the legislature, in determining the grade of theft pursuant to § 53a-121 (b), did not intend a distinction between attempted and completed thefts.

Even if § 53a-121 (b) applies to attempted thefts, however, the defendant claims that he could not be convicted of attempted larceny in the third degree in the circumstances of this case. He argues that the amounts of the two checks involved in this case could not be aggregated under § 53a-121 (b) because the statute does not permit liability of an actor for the attempted offenses of a coconspirator. We disagree.

The defendant's argument finds no support in the language of § 53a-121 (b), which defines the thefts that are subject to aggregation as those committed "pursuant to one scheme or course of conduct." Linguistically, therefore, the statute contains no limitation, either express or implied, that the same actor commit the thefts. "We have no warrant for interpolating into a criminal statute a requirement it does not now contain." State v. Duhan, 194 Conn. 347, 358, 481 A.2d 48 (1984); see State v. Johnson, 227 Conn. 534, 542, 630 A.2d 1059 (1993); State v. Hanson, 210 Conn. 519, 529, 556 A.2d 1007 (1989). Moreover, as a matter of policy, the limitation proffered by the defendant cannot be reconciled with the principle that actors can be held vicariously liable for offenses committed by coconspirators if such offenses are committed in furtherance of a conspiracy and are within the reasonably foreseeable scope of the conspiracy. See State v. Walton, 227 Conn. 32, 43–44, 630 A.2d 990 (1993).

We conclude, therefore, that § 53a-121 (b), when properly read together with § 53a-49, applies to attempted thefts, whether by a defendant or by a coconspirator, in situations in which they are committed as part of the same scheme or course of conduct. Accord-

ingly, we reverse the judgment of the Appellate Court to the contrary with respect to the conviction of attempted larceny in the third degree.[18]

## III

Finally, we consider whether, in the circumstances of this case, the Appellate Court properly concluded that the defendant could not prevail on his claim that the trial court should have held a hearing, sua sponte, after it had received allegations of jury misconduct. The Appellate Court concluded, on the record before it, that the trial court's failure to hold a hearing had constituted a proper exercise of its discretion. We disagree.

The following additional facts are relevant to this issue. As the Appellate Court reported: "The trial court received an anonymous note after the verdict was returned but before sentencing. The note was from 'a concerned citizen and a discenchanted [sic] friend.' The author was concerned about a recent trial and related that, while out with friends, a friend named Dana[19] told

[18] Although the Appellate Court concluded that the jury verdict against the defendant for attempted larceny in the third degree could not stand, it acknowledged that the evidence against the defendant was sufficient to support a finding that he personally had attempted to steal $960 from Gateway Bank. *State* v. *Brown*, supra, 33 Conn. App. 354–55. Accordingly, the Appellate Court reduced the charge of which the defendant had been convicted to the lesser included offense of attempted larceny in the fourth degree. See, e.g., *State* v. *Carpenter*, supra, 214 Conn. 85 (concluding that evidence was insufficient to support conviction of murder and reducing conviction to lesser included offense of manslaughter in first degree). Because the Appellate Court found that the evidence was sufficient as to all of the elements of attempted larceny in the third degree other than the value of property involved, and because we conclude that the jury properly could aggregate the amounts of the checks that the defendant and his coconspirator attempted to cash at Gateway Bank, we remand the case with direction to the Appellate Court to affirm the judgment of guilty of attempted larceny in the third degree.

[19] "There was in fact a juror named Dana L. Clarke who was a member of the jury in the defendant's case." *State* v. *Brown*, supra, 33 Conn. App. 343 n.7.

of being on a jury in the trial of 'a black man . . . on trial for cashing bad checks.' According to the letter, Dana reported that the jurors overheard the sheriffs 'betting that the defendant would be found guilty because he was black and from New York.' In addition, the letter stated that Dana told the author that she had overheard one sheriff tell another that a Wilton detective showed one of the witnesses some pictures because 'the witness couldn't remember what the guy looked like.'[20]

"The trial court gave the letter to the chief sheriff who directed a copy to the state's attorney. The trial court did not direct a copy to defense counsel. Defense counsel did not learn of the letter until the day of sentencing.[21] At that time, the defendant orally amended

---

[20] The letter, in its entirety, read as follows:

"Dear Judge Ripley[:]

"I am writing this letter as a concerned citizen and a discenchanted [sic] friend. Myself and a group of friends were out for drinks this past week and somehow the conversation turned to the subject of a few of us being called for jury duty. My friend Dana [s]tarts telling us about a trial that she had been involved in. I believe the case involves a trial that was held in your court just recently. The case involve[d] a black man that was on trial for cashing bad checks. She was telling us that several times during the course of the trial the jury would be sent back into the jury room[.] She said a few times she could hear conversation from the court room. One day she heard one of the sheriff[s] telling another that he saw a Wilton . . . detective showing some pictures to one of the witnesses because the witness couldn't remember what the guy looked like. I don't know what the legal term for something like this is called, but it is improper to allow that to happen. She also told us about a betting pool that the [sheriffs] had going, they were betting that the defendant would be found guilty because he was black and from New York. Several years ago my brother was found guilty in [a] [c]riminal case because the jury had been allowed to hear things that prejudiced them against him. I didn't think things like this were that common place[.] But I was wrong.

"I have thought about this for several days now and have decided that I should [send] copies of this letter to the Norwalk Hour, Chief Prosecuting Attorney, [a]nd to the defendant's [a]ttorney, Mr. Ste[ph]en [F]einstein."

[21] "It was during the sentencing hearing that the court notified the defendant that it had received an anonymous letter the previous day." *State* v. *Brown*, supra, 33 Conn. App. 344 n.8. The defendant's attorney informed

his motion for a new trial to include the alleged jury misconduct and violation of the sequestration order.[22] The court heard brief argument on both the motion for judgment of acquittal and the motion for a new trial. The court denied both motions and an exception was taken." *State* v. *Brown*, supra, 33 Conn. App. 343–44.

In the Appellate Court, the defendant argued that the trial court had violated his state and federal constitutional rights by failing to conduct an evidentiary hearing, sua sponte, to investigate the allegations of jury misconduct contained in the letter. The Appellate Court rejected this contention because it concluded that the allegations of misconduct contained in the letter, even if accurate, did not demonstrate a violation of the defendant's constitutional rights. Id., 345–46.

On appeal to this court, the defendant reasserts his argument that the trial court's failure to hold an evidentiary hearing violated his state and federal constitutional rights.[23] Although we do not agree with the defendant that the trial court was obligated to conduct an evidentiary hearing, we conclude that, in the circumstances of this case, the trial court improperly failed to conduct any inquiry whatsoever specifically addressing the allegations of jury misconduct contained in the letter.

A

Before addressing the merits of the defendant's claim, we must consider the state's contention that provisions

the court that he had not had any opportunity to investigate the allegations contained in the letter and asked the court to make the letter a part of the record.

[22] The defendant's attorney, however, never asked the trial court to conduct a hearing to determine whether jury misconduct had occurred.

[23] The defendant alleges deprivations of his right to a fair and impartial jury trial, and of his rights to due process and equal protection of the law, pursuant to the fifth, sixth and fourteenth amendments to the United States constitution and article first, §§ 8, 19 and 20, of the Connecticut constitution.

of the Practice Book and established Connecticut precedent preclude appellate review of the trial court's failure to act. We are unpersuaded.

The state makes two arguments. First, the state contends that the defendant was required to raise any claims concerning the letter by filing a petition for a new trial pursuant to Practice Book § 904 rather than a motion for a new trial pursuant to Practice Book § 902. Second, the state maintains that our decision in *State* v. *Sauris*, supra, 227 Conn. 389, precludes an appellate tribunal from ordering the trial court to conduct a hearing in response to the allegations contained in the letter because the defendant had earlier failed to request a hearing. In the circumstances of this case, we disagree with both contentions.

The state's contentions must be assessed within the present procedural posture of this case. At this juncture, the relief that the defendant seeks is not a new trial, but rather a hearing before the trial court. In light of this procedural posture, the provisions applicable to petitions for a new trial are inapposite. *Sauris* is similarly distinguishable because in that case the defendant's claim was that untested representations about statements allegedly made by a juror entitled the defendant, not to a hearing, but to a judgment of acquittal. We conclude, therefore, that the issue whether the trial court was obligated, sua sponte, to conduct a hearing in response to the allegations of jury misconduct is properly before us.

B

Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution.[24] See *State* v. *Rodri-*

[24] The constitution of Connecticut, article first, § 8, as amended by article seventeen of the amendments, provides in relevant part: "In all criminal

*guez*, 210 Conn. 315, 324–25, 554 A.2d 1080 (1989); *State* v. *Brigandi*, 186 Conn. 521, 542, 442 A.2d 927 (1982). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin* v. *Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *State* v. *Ziel*, 197 Conn. 60, 64, 495 A.2d 1050 (1985); *State* v. *Brigandi*, supra, 542. "The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. See *Turner* v. *Louisiana*, 379 U.S. 466, 472–73, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965); *Patterson* v. *Colorado*, 205 U.S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879 (1907)." *State* v. *Rodriguez*, supra, 325. "Consideration [by the jury] of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury." *State* v. *Asherman*, 193 Conn. 695, 736, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *McCall*, 187 Conn. 73, 80, 444 A.2d 896 (1982).

In the past, we have recognized that the trial court has broad discretion to determine the form and scope of the proper response to allegations of jury miscon-

prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by information, to a speedy, public trial by an impartial jury. . . ."

The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

The due process clause of the fourteenth amendment to the United States constitution extends to state court defendants the sixth amendment right to be tried by an impartial jury. *Nebraska Press Assn.* v. *Stuart*, 427 U.S. 539, 551, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976).

duct. See *State* v. *Ross*, supra, 230 Conn. 228; *State* v. *Rodriguez*, supra, 210 Conn. 326; *State* v. *Asherman*, supra, 193 Conn. 735.[25] In exercising that discretion, the trial court "must zealously protect the rights of the accused." *State* v. *Cubano*, 203 Conn. 81, 89, 523 A.2d 495 (1987). We have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. See *State* v. *Ross*, supra, 227–28; *State* v. *Rodriguez*, supra, 326; see also *State* v. *Asherman*, supra, 735. Even with this circumscribed role, we have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. See *State* v. *Carter*, 228 Conn. 412, 421, 636 A.2d 821 (1994). "The trial judge's discretion, which is a legal discretion, should be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Internal quotation marks omitted.) *State* v. *McKnight*, 191 Conn. 564, 576–77, 469 A.2d 397 (1983).

This is one of these highly unusual cases of an abuse of discretion. The facts of record presented an urgent case for the trial court to conduct some type of inquiry in response to the allegations of jury misconduct contained in the letter. Although written anonymously, the letter was accurately addressed to the judge who had presided over the defendant's trial and contained accurate information about the defendant and the charges involved in the case. The letter also contained specific

---

[25] Similarly, at the federal level, district courts have broad discretion to determine whether and how to respond to allegations of jury misconduct. See, e.g., *United States* v. *Console*, 13 F.3d 641, 669 (3d Cir. 1993), cert. denied sub nom. *Curcio* v. *United States*, 511 U.S. 1076, 114 S. Ct. 1660, 128 L. Ed. 2d 377 (1994); *United States* v. *Boylan*, 898 F.2d 230, 258 (1st Cir.), cert. denied, 498 U.S. 849, 111 S. Ct. 139, 112 L. Ed. 2d 106 (1990); *United States* v. *Hillard*, 701 F.2d 1052, 1064 (2d Cir.), cert. denied, 461 U.S. 958, 103 S. Ct. 2431, 77 L. Ed. 2d 1318 (1983).

and facially credible allegations of jury exposure to racially derogatory remarks regarding the defendant allegedly made by court officials, and named as the source of these allegations a person who was accurately identified as a juror. The letter was brought to the trial court's attention in advance of its sentencing of the defendant, and therefore in advance of the rendering of a final judgment. See *State* v. *Garcia*, 233 Conn. 44, 63, 658 A.2d 947 (1995); *State* v. *Ayala*, 222 Conn. 331, 339, 610 A.2d 1162 (1992).

In addition, the record indicates that the defendant had only a limited opportunity to ask for an inquiry into the allegations contained in the letter. After the trial court received the letter, the court gave it to the chief sheriff with instructions to deliver it to the office of the state's attorney. The court did not direct that a copy of the letter be delivered to the defendant's attorney. It was not until the following day, on which the court had scheduled the sentencing hearing, that the defendant's attorney learned of the letter.[26] At that time, the defendant's attorney informed the trial court that he had not had any opportunity to investigate the allegations contained in the letter. Over the state's objection, the defendant's attorney successfully moved to have the letter made a part of the record. Although he did not request a hearing, the defendant's attorney expressly incorporated a claim of jury misconduct into his motions for a judgment of acquittal and for a new trial.

Taken together, these circumstances required a sua sponte preliminary inquiry by the trial court specifically addressing whether the allegations required an investigation or other response. Accordingly, to the extent that the Appellate Court concluded that the trial court

---

[26] The letter stated that copies would be sent by the writer to the "Chief Prosecuting Attorney" and to the defendant's attorney, whose first and last names the writer had misspelled.

properly had exercised its discretion when it failed to conduct such an inquiry, we reverse that judgment. Even if the trial court were ultimately to determine that a full evidentiary hearing was not necessarily required, it was an abuse of discretion for the trial court not to have conducted at least a preliminary inquiry, with the appropriate participation of counsel, into the letter and its auspices.

## C

Our conclusion that some preliminary inquiry was warranted in the circumstances of this case does not, however, end our discussion. Exercising our inherent supervisory power over the administration of justice, we now hold that henceforth a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case,[27] regardless of whether an inquiry is requested by counsel. Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto.

"A great deal is at stake in a criminal trial. The interests involved go beyond the private interests at stake in the ordinary civil case. They involve significant public interests. 'The accused during a criminal prosecution has at stake interests of immense importance, both

---

[27] We do not decide whether the same rule applies in civil cases.

because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction.' *In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Indeed, the criminal jury trial has a role in protecting not only the liberty of the accused, but also the entire citizenry from overzealous or overreaching state authority. *Duncan* v. *Louisiana*, 391 U.S. 145, 156, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). In addition, the state has a valid and weighty interest in convicting the guilty. *Summerville* v. *Warden*, 229 Conn. 397, 427, 641 A.2d 1356 (1994); *State* v. *Sawyer*, 227 Conn. 566, 579, 630 A.2d 1064 (1993)." *State* v. *Patterson*, 230 Conn. 385, 398, 645 A.2d 535 (1994).

The trial judge plays a crucial role in ensuring that a criminal defendant receives a fair trial by an impartial jury, and must be ever vigilant, throughout the course of the trial, to guard against jury partiality. "In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. *State* v. *Echols*, 170 Conn. 11, 13, 364 A.2d 225 (1975)." (Internal quotation marks omitted.) *State* v. *Brigandi*, supra, 186 Conn. 543; see *State* v. *Bausman*, 162 Conn. 308, 312, 294 A.2d 312 (1972). " 'The jury room cannot be guarded with too much vigilance and jealousy. Courts must reject all evidence not received on the trial, and must repel every foreign influence, which may affect the minds of the jury.' " *Esaw* v. *Friedman*, 217 Conn. 553, 559, 586 A.2d 1164 (1991), quoting *Clark* v. *Whitaker*, 18 Conn. 543, 549 (1847).

We recognize that the trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided; *State* v. *Ross*, supra, 230 Conn. 227; *State* v. *Rodriguez*, supra, 210 Conn. 326; and thus

is in a superior position to evaluate the credibility of allegations of jury misconduct, whatever their source. There may well be cases, therefore, in which a trial court will rightfully be persuaded, solely on the basis of the allegations before it and the preliminary inquiry of counsel on the record, that such allegations lack any merit. In such cases, a defendant's constitutional rights may not be violated by the trial court's failure to hold an evidentiary hearing, in the absence of a timely request by counsel.

Even in the absence of constitutional violations, however, this court has supervisory authority over the administration of justice to direct trial courts to adopt judicial procedures that will address matters that are of " 'utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole.' " *State* v. *Holloway*, 209 Conn. 636, 645, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989), quoting *State* v. *Gonzalez*, 206 Conn. 391, 394, 538 A.2d 210 (1988). In each case in which we have invoked our supervisory authority, we have acted to provide additional procedural safeguards for some salient aspect of the right to a trial before an impartial jury. See *State* v. *Breton*, supra, 235 Conn. 250 (special jury verdict form in death penalty cases); *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995) (bifurcation of jury proceedings in some death penalty cases); *State* v. *Patterson*, supra, 230 Conn. 397–98 (personal judicial supervision of voir dire); *State* v. *Holloway*, supra, 645–46 (judicial inquiry into bias claims at voir dire). Similarly, in this case we are persuaded that a trial court must, when presented with any allegations of jury misconduct, conduct a preliminary inquiry, sua sponte if necessary, in order to assure itself that a defendant's constitutional right to a trial before an impartial jury has been fully protected.

Our requirement that any allegations of jury misconduct necessitate some type of a preliminary inquiry still leaves the form and scope of such an inquiry to be determined by the trial court within the exercise of its discretion. See *State* v. *Rodriguez,* supra, 210 Conn. 326; see also *State* v. *Ross,* supra, 230 Conn. 227–28; *State* v. *Cubano,* supra, 203 Conn. 88–89; *State* v. *Asherman,* supra, 193 Conn. 735–36. In the proper circumstances, the trial court may discharge its obligation simply by notifying the defendant and the state of the allegations, providing them with an adequate opportunity to respond and stating on the record its reasons for the limited form and scope of the proceedings held. In other circumstances, the trial court itself may need to cause an investigation of the allegations of jury misconduct to be conducted through informal or formal means. If the trial court determines that a proper assessment of allegations requires an evidentiary hearing, it possesses "wide discretion in deciding how to pursue an inquiry into the nature and effect of information that comes to a juror improperly as well as its potential effect upon the jury if it learns of it. See generally *Marshall* v. *United States,* 360 U.S. 310, 312, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959); *Remmer* v. *United States,* [347 U.S. 227, 229–30, 74 S. Ct. 450, 98 L. Ed. 654 (1954)]; *United States* v. *Hillard,* [701 F.2d 1052, 1064 (2d Cir.), cert. denied, 461 U.S. 958, 103 S. Ct. 2431, 77 L. Ed. 2d 1318 (1983)]." *State* v. *Rodriguez,* supra, 326; see *State* v. *Savage,* 161 Conn. 445, 449–50, 290 A.2d 221 (1971). Any form of proceeding, of course, must be on the record. See *State* v. *Savage,* supra, 450.

In future cases, a trial court may find it helpful to be guided by the following factors in exercising its discretion as to the form and scope of an inquiry into allegations of jury misconduct. By analogy to the law of procedural due process, the court should consider the following: "[f]irst, the private interest that will be

affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) *Chmielewski* v. *Aetna Casualty & Surety Co.*, 218 Conn. 646, 662, 591 A.2d 101 (1991); see *State* v. *Morales*, 232 Conn. 707, 721, 657 A.2d 585 (1995); *Harkless* v. *Rowe*, 232 Conn. 599, 625, 657 A.2d 562 (1995).

The first factor, the private interest involved, focuses on the criminal defendant. Because the interest at stake is the defendant's constitutional right to a trial before an impartial jury, this "private interest" is always substantial. In assessing this interest, the trial court should give proper weight to the defendant's response, expressed through counsel, to the allegations of jury misconduct. See *State* v. *McCall*, supra, 187 Conn. 82 n.4. If the defendant requests only a minimal type of proceeding, the trial court should honor the defendant's request, unless the court is persuaded that other factors warrant a more extensive inquiry. Before the trial court may honor the defendant's request, however, it must fully inform the defendant of the allegations and provide the defendant with an adequate opportunity to respond thereto, and the defendant must, through counsel, state on the record his or her preference for a minimal proceeding. In contrast, although the defendant can request an evidentiary hearing, the trial court should not hold such a proceeding if it is persuaded that a less extensive inquiry is more appropriate in light of all the circumstances.

The second factor, the risk of deprivation of a defendant's constitutional right to a trial before an impartial jury, varies with the seriousness and the credibility of

the allegations of jury misconduct. The more obviously serious and credible the allegations, the more extensive an inquiry is required; frivolous or incredible allegations may be disposed of summarily. A proper assessment of the seriousness of allegations will require the trial court to take into account the prejudicial nature of the alleged misconduct as well as the nature and degree of the jury's alleged involvement in the misconduct. See *State* v. *Asherman,* supra, 193 Conn. 736; *State* v. *McCall,* supra, 187 Conn. 80–82. A proper assessment of the credibility of the allegations will require the trial court to weigh the source of the allegations. Allegations made by identifiable and reliable sources, such as court personnel and jurors, are presumably entitled to more credit than are similar allegations made by an anonymous source. At the same time, however, corroboration and other indicia of reliability may enhance the credibility of even anonymous allegations.

The third factor focuses on the state's interest. Although both the state and a criminal defendant have an interest in impartial jury trials; see *State* v. *Patterson,* supra, 230 Conn. 398; after a jury verdict has been accepted, other state interests emerge that favor proceedings limited in form and scope. The state has a strong interest in the finality of judgments; see *Summerville* v. *Warden,* supra, 229 Conn. 428; *Myers* v. *Manson,* 192 Conn. 383, 387, 472 A.2d 759 (1984); and in protecting the privacy and integrity of jury deliberations, preventing juror harassment and maintaining public confidence in the jury system. See generally *Tanner* v. *United States,* 483 U.S. 107, 120–21, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987).

Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jury misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial

court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them.

## IV

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand it to the trial court for further proceedings regarding the issue of jury misconduct consistent with this opinion.

In this opinion BORDEN, NORCOTT, O'CONNELL and HENNESSEY, Js., concurred.

BERDON, J., with whom KATZ, J., joins, dissenting. After our decision in *State* v. *Brown*, 232 Conn. 431, 656 A.2d 997 (1995) (*Brown I*), the majority of this court granted the state's motion for en banc reargument and reconsideration of the issues we originally certified from the Appellate Court. Although I fully adhere to the opinion in *Brown I*, I wish to emphasize some points that were made in that decision and respond to the present majority's opinion (*Brown II*).

## I

With respect to the sufficiency of the evidence issues relative to forgery in the third degree; General Statutes § 53a-140 (a);[1] the majority has enlarged the scope of that offense. Section 53a-140 (a) requires that the defendant falsely *make, complete* or *alter* a written instrument. The majority, focusing on the element of falsely *completing* a written instrument, relies on the following facts to conclude that the state proved that the defendant was guilty of forgery in the third degree beyond a reasonable doubt: (1) the checks in question did not belong to the defendant; (2) the defendant was

---

[1] See footnote 2 of the majority opinion.

engaged in a scheme of illegally cashing checks; and (3) the defendant falsely represented his identity in attempting to cash the checks at the bank. Undoubtedly, the foregoing evidence is sufficient to support a conviction for attempted larceny in the third degree in violation of General Statutes § 53a-124 (a)[2]—that is, the defendant attempted "to deprive another of property or to appropriate the same to himself . . . ." General Statutes § 53a-119. Indeed, the defendant was charged with and convicted of this crime, and does not challenge the sufficiency of the evidence for his conviction under § 53a-124 (a). From these facts, however, it cannot be concluded that the defendant made, completed or altered the two checks he presented to the bank.

As we noted in *Brown I*: "The state failed to present any evidence whatsoever that the payee's name, the amount or the drawer's signature on either of the checks was not properly authorized. The state did not call [Beth Anne] Onderko or any representative of St. Pauls Inn, on whose accounts the allegedly improper checks were drawn, to testify that the checks were not genuine. The state did not call [Clifford] Sailer to testify that he had not personally endorsed the checks [both of which were made payable to him,] or that he had not authorized anyone to do so on his behalf. Moreover, although the state asserts in its brief to this court that some of the checks found in the car 'appeared to have been completed in the same handwriting,' the state failed to call an expert witness to compare the handwriting. Indeed, the only witness to testify about the appearance of the checks [and who was familiar with Sailer's signature]—the bank teller who dealt with the defendant—indicated that the signatures of Sailer appeared to be genuine." *Brown I*, supra, 232 Conn. 438.

Although I agree with the majority that the evidence should be reviewed "in the light most favorable to sus-

---

[2] See footnote 3 of the majority opinion.

taining" the jury's verdict, there are fundamental constitutional principles that override this general tenet and that must govern our determination in this case. "Each essential element of the crimes charged must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Though the jury may draw reasonable, logical inferences from the facts proven, [it] may not resort to speculation and conjecture. *State* v. *Saracino*, 178 Conn. 416, 419, 423 A.2d 102 (1979). Where it cannot be said that a rational trier of fact could find guilt proven beyond a reasonable doubt, then, a conviction cannot constitutionally stand, as it is violative of due process under the fourteenth amendment. *Jackson* v. *Virginia*, 443 U.S. 307, 317–18, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State* v. *Kish*, 186 Conn. 757, 768, 443 A.2d 1274 (1982). . . . *State* v. *Haddad*, 189 Conn. 383, 387–88, 456 A.2d 316 (1983). *State* v. *Brown*, 199 Conn. 14, 21–22, 505 A.2d 690 (1986)." (Internal quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365, 385–86, 545 A.2d 1048 (1988).

Accordingly, I remain convinced that the Appellate Court was correct. I see no reason to depart from the unanimous opinion in *Brown I* in which the panel agreed, after *carefully considering* all the testimony and listening to the same arguments that were made to us by the state, that there was insufficient evidence to support a conviction of forgery in the third degree under § 53a-140 (a).

## II

I also disagree with the majority's expansion of criminal liability under the aggregation statute, for such an expansion is contrary to the plain and unambiguous language of General Statutes § 53a-121 (b). The majority ignores our time honored, and indeed constitutionally required, rule of statutory construction: "It is axiomatic that *'penal statutes and rules of criminal procedure*

*are to be strictly construed* to protect the fundamental constitutional right to liberty.'" (Emphasis added.) *State* v. *Shockley*, 188 Conn. 697, 714, 453 A.2d 441 (1982). As this court has previously recognized, our analysis "must begin with the proposition that penal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create. . . . This principle of strict construction informs the general rule of statutory interpretation that in the interpretation of statutes, the intent of the legislature is to be found not in what it meant to say, but in what it did say. . . . If the words are clear and unambiguous, it is assumed that [they] express the intention of the legislature . . . and we need inquire no further." (Citations omitted; internal quotation marks omitted.) *State* v. *Lubus*, 216 Conn. 402, 406–407, 581 A.2d 1045 (1990).

Section 53a-121 (b) provides: "Amounts included in *thefts committed* pursuant to one scheme or course of conduct, whether from the same person or several persons, may be aggregated in determining the grade of the offense." (Emphasis added.) The plain language of § 53a-121 (b) refers to *"committed"* thefts, not *attempted* thefts. "Committed" is simply the past form of the verb to commit and should be given its ordinary meaning—done or performed. Webster's Third New International Dictionary (1971). Therefore, the plain and unambiguous language of § 53a-121 (b) requires us to conclude that the phrase "thefts committed" refers to the aggregation of *completed* acts of larceny and has no reference to that which is merely attempted.

Even if we were to conclude that the phrase "thefts committed" was ambiguous and that we are required to search for the legislative intent, I am unable to reach the majority's conclusion. First, the majority fails to identify any legislative history, either by way of legislative debates or testimony before the legislative commit-

tees, that supports its interpretation of the statute. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 39–40, 664 A.2d 719 (1995) ("We begin our analysis with the principles of statutory interpretation. First, we look to the words of the statute in order to discern the intent of the legislature and then resolve any ambiguity by turning for guidance to the legislative history and purpose.") Second, the majority fails to employ the fundamental canon of statutory construction that if there is any ambiguity surrounding the interpretation of a penal statute, the statute must be construed in a manner most favorable to the accused. *State* v. *White*, 204 Conn. 410, 424, 528 A.2d 811 (1987); *State* v. *Bunkley*, 202 Conn. 629, 641, 522 A.2d 795 (1987); *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986); *State* v. *Rawls*, 198 Conn. 111, 122, 502 A.2d 374 (1985). Under our statutory scheme, criminal liability is imposed on two types of acts: (1) attempted crimes and (2) completed crimes. If § 53a-121 (b) is to be interpreted in a narrow manner most favorable to the defendant, "thefts committed" must refer only to *completed* acts of larceny.

The majority's doomsday prophecy that "a whole host of penal code provisions" will be abrogated if the phrase "thefts committed" is not interpreted to include attempted thefts is without substance. The majority cites as an example General Statutes § 53a-59a (a), which provides: "A person is guilty of assault of a victim sixty or older in the first degree, when he *commits* assault in the first degree under section 53a-59 (a) (2), 53a-59 (a) (3) or 53a-59 (a) (5) and the victim of such assault has attained at least sixty years of age or is blind or physically disabled, as defined in section 1-1f." (Emphasis added.) Because § 53a-59a (a) defines criminal conduct, liability for attempting to commit such an assault is created as a result of General Statutes § 53a-49. Section 53a-49 does not transform an

"attempt" into a "committed" crime; rather it creates a new liability for the attempted crime.[3] Section 53a-121, however, does not define criminal conduct, but rather it merely pertains to the valuation of property involved in a crime. In other words, an individual cannot violate § 53a-121. Consequently, § 53a-49 has no impact upon § 53a-121. The other penal provisions enumerated by the majority, which define criminal conduct, require the same analysis as § 53a-59a (a). Therefore, in light of the statute's plain language and our long held canons of statutory construction, "thefts committed" should be interpreted to refer to *completed* acts of larceny.

Accordingly, I continue to agree with the Appellate Court and will stand by our unanimous decision in *Brown I*, supra, 232 Conn. 431.

### III

Although I concur with the majority that this case must be remanded for a hearing on the alleged jury misconduct, I reach that conclusion by way of a different route. Because the jury is a bedrock of our democracy, I adhere to our original conclusion in *Brown I* that such a hearing on jury misconduct is required under the state constitutional right to due process and the right to jury trial. As the *Brown I* opinion indicated, this conclusion is based upon our early common law.

The conclusion that a hearing is mandated under our state constitution, rather than our supervisory powers, is underscored in a case such as this where the allegations involved the jury's possible exposure to racist

---

[3] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

remarks made by the court's own sheriffs. See *State* v. *Smith*, 222 Conn. 1, 30, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992) (*Berdon, J.*, dissenting) ("Racial prejudice and bigotry unfortunately are still prevalent in our society and they are facts to which we cannot close our eyes and pretend that they do not exist. It is, at times, hard to detect."); *State* v. *Holloway*, 209 Conn. 636, 645, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

With regard to the scope of the inquiry or hearing, the majority appears to agree with the following passage from *Brown I*: "The nature and scope of this hearing, of course, will depend on the nature of the allegations of juror misconduct. 'There is no magic formula that the trial court must follow in conducting this inquiry. Rather, it must use whatever inquisitorial tools are necessary and appropriate to determine whether there was a "reasonable possibility" of prejudice.' . . . The only limitation upon the court is that, in taking whatever investigatory actions it deems appropriate, it does so with counsel for both parties present and with an opportunity to participate in the proceedings. . . . These proceedings, of course, must be recorded by the court reporter. . . .

"A trial court not only has wide discretion in deciding how to pursue the initial inquiry, but also in determining 'the nature and effect of information that comes to a juror improperly as well as its potential effect upon the jury if it learns of it. . . .' Similarly, in cases where the court determines that the defendant has been prejudiced, the court is vested with discretion to grant the defendant's motion for a mistrial or, if the verdict has already been rendered, to grant a motion to set aside the verdict." (Citations omitted.) *Brown I*, supra, 232 Conn. 451–52.

Accordingly, I concur with part III of the majority opinion to the extent that this case must be remanded to the trial court in order to conduct an inquiry into the allegations of jury misconduct. I respectfully disagree with parts I and II of the majority opinion.